UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DENNIS TOSSI,

  Plaintiff,

 v.

UNITE HERE LOCAL 1,

  Defendant.

No. 16 CV 8754

Judge Manish S. Shah

## MEMORANDUM OPINION AND ORDER

Dennis Tossi, a patron of Ameristar Casino, brought claims against UNITE HERE Local 1 in the Circuit Court of Cook County for false-light invasion of privacy and intentional infliction of emotional distress arising from the union's alleged conduct toward Tossi's neighbors, employees and customers of his business, and a company consulting for his business. Local 1 removed the action under federal-question jurisdiction, arguing that Tossi's claims are preempted under 29 U.S.C. §§ 158(b)(4) and 187,[1] which allow private suits against labor organizations for secondary boycott activity. Tossi moves to remand. For the following reasons, the motion to remand is denied.

## I. Background

Dennis Tossi is part owner of Albany Care, an intermediate care facility located in Evanston, Illinois, which is dedicated to treating individuals suffering

---

[1] Sections 158(b)(4) and 187 are also referred to as § 8(b)(4) of the National Labor Relations Act and § 303 of the Labor Management Relations Act, respectively.

from chronic mental illnesses. Tossi is a patron of Ameristar Casino, located in East Chicago, Indiana. Ameristar employs unionized workers represented by UNITE HERE Local 1. The union began a boycott of Ameristar when union workers went on strike in March 2015. Tossi alleges that since January 2016, Local 1 has:

- Distributed flyers at the private residences of Tossi's neighbors, which stated that members of the union have not had a fair contract since 2013 and that the affordable family health care plan they had for years was taken away;

- Approached Tossi's neighbors, advised them that he has been "a regular customer of Ameristar and has not signed a pledge to boycott Ameristar," and asked "What would you do if it was YOUR family's health insurance?"

- Approached persons and businesses neighboring Albany Care while making similar statements and advising these persons that Tossi "works a neighboring business Albany Care;"

- Appeared at Albany Care and made similar statements to employees, residents, and visitors;

- Sent letters to Tossi's business partners stating that members of the union have not had a fair contract since 2013 and that the affordable family health care plan they had for years was taken away;

- Appeared at Generations Healthcare Network, a consulting company to Albany Care, and picketed with a sign reading "Tell Dennis Tossi to Boycott Ameristar Casino."

[1-1] ¶ 7.[2] Tossi alleges that these actions placed him in a false light by implying that his refusal to boycott Ameristar meant that he did not want its employees to have access to affordable health care, and he alleges that these actions were extreme and outrageous conduct that intentionally inflicted emotional distress. [1-1] ¶¶ 9–16.

---

[2] Bracketed numbers refer to entries on the district court docket.

## II. Analysis

Ordinarily, a court must determine the existence of a federal question by examining only the plaintiff's well-pleaded complaint—a federal defense to a state cause of action is typically insufficient to create a federal question, even if the defense relies on the preemptive effect of a federal statute. *Smart v. Local 702 Int'l Bhd. of Elec. Workers*, 562 F.3d 798, 803 (7th Cir. 2009) (citing *Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987), *Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 152 (1908), and *Beneficial Nat'l Bank v. Anderson*, 539 U.S. 1, 6 (2003)). The exception to the well-pleaded complaint rule is the "complete preemption" doctrine, which comes into play when "the preemptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" *Id.* (quoting *Nelson v. Stewart*, 422 F.3d 463, 466–67 (7th Cir. 2005)). When complete preemption applies, it substitutes a federal cause of action for the state cause of action, thereby manifesting Congress's intent to extend the jurisdiction of the federal courts to such cases. *Id.*

Section 8(b)(4) of the National Labor Relations Act prohibits an attempt by a labor organization "to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an object thereof is . . . forcing or requiring any person . . . to cease doing business with any other person." 29 U.S.C. § 158(b)(4)(ii)(B). Activities that arguably fall under § 158(b)(4)'s prohibition against secondary boycotts are completely preempted, even if articulated under a state-law claim. *See Smart*, 562 F.3d at 806–08. Tossi does not address *Smart*, and he does

3

not dispute that 29 U.S.C. § 187(b) completely preempts state-law claims that arguably fall under § 158(b)(4). Instead Tossi merely restates the well-pleaded complaint rule, which does not apply in instances of complete preemption.

## A. Standing

Whether Tossi's state-law claims are completely preempted depends on whether the complaint alleges conduct arguably falling under § 158(b)(4) and whether Tossi would have standing to sue under § 187(b) for such secondary boycott activity. Section 187(b) authorizations private suits by "[w]hoever shall be injured in his business or property" because of § 158(b)(4) violations. While this provision's broad language is not "carried to its literal limits to confer a cause of action upon all persons suffering damage as a result of secondary boycott activity," *W.J. Milner & Co. of Fla. v. Int'l Bhd. of Elec. Workers, Local 349*, 476 F.2d 8, 11 (5th Cir. 1973), it extends beyond primary and neutral employers to include third parties "sufficiently affected by a union's illegal secondary picketing" and whose injuries were reasonably foreseeable by the union. *Abreen Corp. v. Laborers' Int'l Union, N.A., AFL, AFL-CIO*, 709 F.2d 748, 753 (1st Cir. 1983) (contractor and owners of construction site had standing to sue union for losses incurred as a result of allegedly illegal secondary picketing); *see W.J. Milner*, 476 F.2d at 12 (sales agent of primary employer had standing to sue labor unions for secondary boycott under § 187 where agent was directly in line of fire of secondary boycott and the resulting injury was reasonably foreseeable by the union). Therefore, Tossi's argument that he is not a neutral employer does not necessarily prevent him from having standing to sue for secondary boycott activity.

4

Business owners have brought suit under § 187 for unfair labor practices resulting in injury to their business. *See, e.g., Smart*, 562 F.3d at 801, 808–09; *Silverman v. Verrelli*, No. CIV.A. 11-6576 SRC, 2012 WL 395665, at *1 (D.N.J. Feb. 7, 2012) (denying motion to remand state-law claims brought by president and CEO of an organization of real estate development companies because his claims were preempted by § 158(b)(4)(ii)(B)); *see also Sapp v. Drivers, Chauffeurs & Helpers, Local Union 639*, 542 F.2d 224, 225 (4th Cir. 1976) (trucker employed by subcontractor of the prime employer had remedy under § 187(b) for union's unfair labor practices where one of the union's objects was to replace him with a trucker who employed union members). Although Tossi is a part-owner of Albany Care, not a sole proprietor, there is nothing in the statute precluding him from bringing suit under § 187, and he does not cite any authority preventing a part-owner or partner from filing suit for business injuries resulting from unfair labor practices.

### B. Secondary Boycott Activity

Looking to Tossi's state-law complaint, it alleges conduct by Local 1 arguably falling under § 158(b)(4)'s prohibition against secondary boycott activity. Section 158(b)(4)(ii)(B) prohibits an attempt by a labor organization "to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an object thereof is . . . forcing or requiring any person . . . to cease doing business with any other person." Tossi does not generally dispute that Local 1's activities may have overstepped the bounds of § 158(b)(4), [18] at 4, and he acknowledges that Local 1's alleged conduct "may or may not be actionable under the NLRA." [18] at 5. Tossi's complaint alleges conduct that even Local 1 concedes is

5

arguably coercive under § 158(b)(4), including that Local 1 picketed a consulting company for Albany Care. *See* [17] at 9–10. Secondary picketing is considered coercive activity because it "creates a physical barrier between a business and potential customers, thereby 'keeping employees away from work or keeping customers away from the employer's business.'" *520 S. Mich. Ave. Assocs. Ltd. v. Unite Here Local 1*, 760 F.3d 708, 720 (7th Cir. 2014) (quoting *Kentov v. Sheet Metal Workers' Int'l Ass'n Local 15*, 418 F.3d 1259, 1265 (11th Cir. 2005)); *see also N.L.R.B. v. Retail Store Emps. Union, Local 1000*, 447 U.S. 607, 618–19 (1980) (*Safeco*) (Stevens, J., concurring in part). Tossi argues, however, that § 158(b)(4) cannot apply to union conduct directed at him because he is not a neutral employer, he is not in commerce, and because his patronage of the casino has nothing to do with his part-ownership of Albany Care or Albany Care's business.

Tossi cites to *Local 1976, United Brotherhood of Carpenters*, 357 U.S. 93, 101 (1958) (*Sand Door*), *International Brotherhood of Electrical Workers, Local 501 v. N.L.R.B.*, 181 F.2d 34, 37 (2d Cir. 1950), *aff'd sub nom.* 341 U.S. 694 (1951), and *National Woodwork Manufacturers Association v. N.L.R.B.*, 386 U.S. 612, 627 (1967) for the proposition that for § 158(b)(4) to apply, Tossi must be a "neutral employer." None of these cases interpret the person-in-commerce element of § 158(b)(4)(ii)(B). Notably, *Sand Door* and *Local 501* were decided prior to the 1959 amendment of § 158(b)(4), which added subsection (ii), and Tossi's quotation from *National Woodwork* merely quotes *Sand Door*. Moreover, *Local 501* suggests that the particular business relationship between the third party and the primary

6

employer is irrelevant to secondary boycott liability. *See Local 501*, 181 F.2d at 37 ("The gravemen [sic] of a secondary boycott is that its sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it. Its aim is to compel him to stop business with the employer in the hope that this will induce the employer to give in to his employee's demands. We cannot see why it should make any difference that the third person is engaged in a common venture with the employer, or whether he is dealing with him independently.").

The text of § 158(b)(4)(ii)(B) does not require that the union threaten or coerce a "neutral employer" but instead that the union threaten or coerce "any person engaged in commerce or in an industry affecting commerce." While many cases refer to the secondary target under § 158(b)(4)(ii)(B) as a "secondary employer" or "neutral employer," Tossi has not cited any authority interpreting "any person engaged in commerce or in an industry affecting commerce" to apply only to neutral employers or to preclude an individual business owner from bringing suit for secondary boycott activity under § 158(b)(4)(ii)(B). Other courts have permitted individual business owners to state a claim for conduct arguably covered by § 158(b)(4)(ii)(B). *See, e.g., Smart*, 562 F.3d at 801, 806–08; *Silverman*, 2012 WL 395665, at *1, 4–7.

Moreover, § 158(b)(4)(ii)(B) also covers tertiary labor activity, when a union widens a labor dispute to include businesses and affiliates whose relationship to the primary employer is extremely attenuated, in order to place pressure on the

7

secondary target, to in turn place pressure on the primary employer. *See 520 S. Mich. Ave.*, 760 F.3d at 731. The statute broadly provides that "an object" of the union's coercion need only be to "forc[e] or require[e] any person . . . to cease doing business with any other person." 29 U.S.C. § 158(b)(4)(ii)(B). It does not require that the union's only object be to force secondary targets or customers to cease doing business with the primary employer. Indeed, § 158(b)(4)(ii)(B) was designed to prevent "[n]eutrals with only the most distant connection to a struck employer" from becoming "collateral damage in a bruising labor battle." *520 S. Mich. Ave.*, 760 F.3d at 731. According to Tossi's allegations, Local 1's method of pressuring Tossi to stop patronizing the casino involved Local 1 not only communicating with his neighbors but also engaging in potentially coercive conduct with his business's neighbors, employees, residents, visitors, and its consulting company Generations Healthcare—and presumably Generations Healthcare's customers. By allegedly widening the labor dispute to include business affiliates of customers of the casino, whose link to the strike against Ameristar is extremely attenuated, Local 1 is alleged to have engaged in "the sort of scorched-earth strategy that Section 158(b)(4)(ii)(B) was designed to avoid." *Id*. It does not matter for the purposes of § 158(b)(4)(ii)(B) that Tossi's patronage of Ameristar Casino is unrelated to Albany Care's residential mental health care business, other than through the union's alleged conduct.

For § 158(b)(4)(ii)(B) to apply, however, the union must threaten or coerce a "person engaged in commerce or in an industry affecting commerce." Because

8

"affecting commerce" under the NLRA encompasses the jurisdictional breadth of the Commerce Clause, *N.L.R.B. v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226 (1963), "commerce" under § 158(b)(4)(ii)(B) is essentially interstate commerce. *See also Charles D. Bonanno Linen Serv., Inc. v. McCarthy*, 708 F.2d 1, 3 (1st Cir. 1983) (in removal action, looking to the face of the state complaint for "the necessary 'interstate commerce' allegations, namely that both the secondary boycott's ultimate target ([the primary employer]) and its innocent targets were in an 'industry affecting [interstate] commerce'") (quoting 29 U.S.C. §§ 158(b)(4), 187). Tossi distinguishes *Bonanno* because the impact of interstate commerce was ascertainable on the face of the *Bonanno* state complaint, due to an allegation referring to the parties' use of a federal mediation service available only in industries affecting interstate commerce. *Bonanno*, 708 F.2d at 4.

Here, Tossi's complaint does not explicitly allege that Albany Care's business or industry involves interstate commerce, but it does allege that Albany Care is an intermediate care facility dedicated to the treatment and recovery of individuals suffering from chronic mental illness, that Albany Care has employees, residents, and visitors, and that Generations Healthcare Network is a consulting company to Albany Care (no location is given for Generations Healthcare). [1-1] ¶¶ 2, 7. These allegations are sufficient to infer that Albany Care is in the residential mental

health care industry. The health care industry involves interstate commerce, as indicated by the NLRA's coverage over "health care institutions."[3]

Notably, Tossi does not challenge Local 1's arguments that the residential health care industry is an industry affecting interstate commerce. Instead Tossi merely argues that Albany Care's commerce cannot be attributable to Tossi because he is only a part-owner—he asserts it would be akin to finding that any stockholder is engaged in commerce for the purpose of secondary labor activity. But Tossi's complaint alleges that he is more than a mere shareholder of Albany Care, specifically that he is "part owner" of Albany Care in conjunction with "business partners," that Albany Care is Tossi's "place of business," and that Local 1's actions (which were largely directed at Albany Care) were intended to damage him "both financially and professionally." [1-1] ¶¶ 2, 7. These allegations are sufficient to infer that Tossi is engaged in commerce.

---

[3] The NLRA was enacted pursuant to the Commerce Clause, *see Reliance Fuel*, 371 U.S. at 226, and later was extended to cover "health care institutions"—specifically to obligate parties to labor disputes to give advance notice of such disputes in health care institutions. *See* 29 U.S.C. §§ 152(14), 158(d)(A)–(C), 158(g); *Beth Israel Hosp. v. N.L.R.B.*, 437 U.S. 483, 496 n.12 (1978). The NLRA defines "health care institution" to "include any hospital, convalescent hospital, health maintenance organization, health clinic, nursing home, extended care facility, or other institution devoted to the care of sick, infirm, or aged person." 29 U.S.C. § 152(14). Although the advance notice requirements for health care institutions are not directly applicable to this action, the NLRA's coverage implies that the health care industry is an industry affecting interstate commerce. This, combined with the allegations that Albany Care is a residential mental health care facility, sufficiently allege that Tossi, as part-owner of Albany Care, is an individual engaged in an industry affecting interstate commerce. Therefore the court need not address Local 1's argument that the interstate commerce requirement is met because Tossi patronizes Ameristar, a casino, and the NLRB has asserted jurisdiction over the casino gaming industry.

The allegations in Tossi's complaint arguably fall under § 158(b)(4)(ii)(B) and therefore his state law claims are completely preempted by federal law. *See Smart*, 562 F.3d at 806–08. The complaint is therefore understood to allege a claim under § 158(b)(4)(ii)(B), and the case will proceed accordingly. If Tossi wishes to amend his complaint, he has leave to do so.

### III. Conclusion

Plaintiff's motion to remand, [16], is denied.

ENTER:

Manish S. Shah
United States District Judge

Date: 12/19/2016